[No. 21171. *En Banc.* November 30, 1928.]

THE STATE OF WASHINGTON, *Respondent*, v. LUTHER BAKER *et al., Appellants.*[1]

[1] Reported in 272 Pac. 80.

*Crass & Hardin,* for appellants.

*Dale McMullen* and *Claude C. Snider,* for respondent.

PARKER, J.—The defendants were, by information verified by the prosecuting attorney for Clark county and filed in the superior court for that county, charged with the crime of murder in the first degree, as follows:

"That they, the said Luther Baker, Ellis Baker and Lewis 'Ted' Baker, on or about the 22nd day of May, 1927, in the county of Clark, state of Washington, did, then and there, with a premeditated design to effect the death of Lester M. Wood, sheriff of said Clark county, and any other officer who might attempt to inquire into and interfere with the illicit liquor operations then being carried on by defendants, and without excuse or justification, unlawfully and feloniously shoot, kill and murder said Lester M. Wood, he, the said Lester M. Wood, then and there dying as a result of the unlawful acts of said defendants."

The defendant Lewis Baker is commonly known as "Ted" Baker. This manifestly accounts for designating him as he is named in the above quoted charge. We shall hereafter refer to him as "Ted," and the other defendants as Luther and Ellis, respectively. The defendants each being duly arraigned, each attacked the information by motion and demurrer, which, upon hearing, the trial court overruled. Thereinafter, on June 27, 1927, each in person, being then also represented in court by counsel, pleaded not guilty. The court at that time set the case for trial on the merits to commence on July 25, 1927. Before the day set for trial, some other motions and objections hereinafter to be noticed were disposed of by the court adverse to the claims of the respective defendants.

On July 25, 1927, the case proceeded to trial upon the merits before the court sitting with a jury, and continued until August 4, 1927, when the jury returned its verdicts finding Luther guilty of murder in the first degree and that the death penalty shall be inflicted upon him, finding Ellis guilty of murder in the first

degree but that the death penalty shall not be inflicted upon him, and finding Ted guilty of murder in the first degree but that the death penalty shall not be inflicted upon him.

The court, having overruled appropriate timely motions challenging the sufficiency of the evidence to sustain any conviction as against Ellis and Ted, made respectively in their behalf, and having overruled their respective motions for new trial which were, in effect, motions in the alternative to their prior challenges to the sufficiency of the evidence to sustain any conviction against either of them, and having overruled the motion for new trial made in behalf of Luther, rendered a final judgment against each of the defendants, that Luther shall suffer the death penalty, that Ellis shall suffer life imprisonment and that Ted shall suffer life imprisonment. From this final disposition of the case in the superior court, all of the defendants have appealed to this court.

Luther was fifty-nine years old at the time of the homicide. He has lived near the village of Hockinson, some twelve miles northeasterly from Vancouver, in Clark county, practically all his life since he was two or three years old. He has, generally speaking, been a farmer, though he has frequently worked away from home at other employment. Ellis was fifty-one years old at the time of the homicide. He is a brother of Luther and the father of Ted. He has lived practically all his life near Hockinson, being born there. He has, generally speaking, been a farmer, though he has frequently worked away from home. Ted is a son of Ellis, and was twenty-one years old at the time of the homicide. He was born near Hockinson and has lived there practically all his life, though he was living in Vancouver for some time immediately prior to the homicide.

Luther and Ellis have for many years hunted to a considerable extent with firearms in the foothills and mountains to the east of Hockinson, and for many years have possessed firearms and are experienced in their use. It was common for them to carry firearms when they went frequently into the hills and mountains, whether they went there for hunting or to look after their stock, which they frequently let graze and range over that country. It is not far to the east of Hockinson that the foothills of the Cascade mountains begin to rise.

Over what may be termed the first range of hills there is the Dole valley, some ten miles northeasterly from Hockinson. There is a rough road from Hockinson in a somewhat direct northeasterly course over the first range of hills to Dole valley. This road is but little improved, and, while not suitable for automobile travel, it is possible to so use it. It is, however, quite suitable for the driving of stock over it. The most practical way for automobile travel, and by far the most used way, into Dole valley, is over a good road northerly from Vancouver or Hockinson to the Lewis river, thence easterly up the Lewis river, thence southerly up Rock creek which drains Dole valley. This roundabout way to Dole valley is several miles longer than by the hill road.

In Dole valley, several miles south of its junction with the Lewis river and some one hundred yards west of Rock creek, is an old logging camp, having a few old camp buildings, called Huston's camp. The county road there runs southerly up Rock creek and the valley just west of Huston's camp. The hill road from Hockinson comes into this road some distance north of Huston's camp. Some three-quarters of a mile southwesterly from Huston's camp is the Erion place, with its small house, barn, corral and some cleared

land. Huston's camp is a place frequented by picnickers and campers coming to Rock creek, in Dole valley, for recreation and fishing. East of Rock creek and the valley, the country rising higher towards the mountains is wild and unsettled, and at some distance back is sufficiently open for grazing of stock. The country for a considerable distance back on each side of Rock creek has been heavily timbered, but was logged off years ago, and now has for the most part a dense second growth. This is particularly true all over the comparatively limited territory here in question.

There is a so-called horse trail leading from Huston's camp north and east several hundred yards to Rock creek, where it crosses the creek by a ford just south of where a small creek called Smith creek comes into it from the east. The horse trail from there leads on easterly up the hill and clear beyond the territory with which we are here concerned.

There is a foot trail, not practical for horse travel, leading from the road a very short distance south from Huston's camp, a hundred yards or more down to Rock creek at a point directly east of Huston's camp, crossing the creek on a footlog and leading thence up the hill northeasterly for a distance a little more than an eighth of a mile to the horse trail. The junction of these two trails is approximately an eighth of a mile east of the Rock creek ford of the horse trail. A short distance, about one hundred feet, east of the junction of the foot trail and the horse trail, there is a somewhat obscured trail leading from the horse trail some two hundred feet northerly down to a secluded place near Smith creek. At the time of the homicide, and for some time prior thereto, there was maintained at that place a large still, which was then being used for the manufacture of intoxicating liquor.

During what may be called the stock grazing seasons of some five years prior to the date of the homicide, the Bakers had taken their cattle from Hockinson over the hill road to Dole valley, for range and pasturing in the unsettled country beyond. Their cattle were, during these seasons, left there practically without any attendant, though they would be visited occasionally by some of the Bakers, and in the fall rounded up and taken back to Hockinson. In the spring of 1927, near the first of May, the Bakers, as theretofore, took their cattle into Dole valley, and, having made arrangements for use of the Erion place for the summer, some week or two before May twenty-second established themselves there for the summer, intending to make some use of the place in connection with the care of their cattle during the summer. They then had with them firearms, consisting of two rifles, at least one of which remained there until after the homicide.

About the time the Bakers established themselves at the Erion place, Ted brought into the Dole valley a large still suitable for the manufacture of intoxicating liquor. Before establishing the still, Luther assisted Ted in searching for a suitable secluded place for its establishment. They found what they conceived to be a suitable place near the south bank of Smith creek, at the place we have already noticed the still as being established. Ellis and Ted, his son, were owners of interests in the still and, as such, interested in its operation and protection. Luther claims not to have had any such interest, but we think the evidence fully warranted the jury in believing Luther to be interested in the still and its protection.

After taking the still into Dole valley ·and prior to the homicide, Ted made several trips in his Ford automobile from Vancouver and Hockinson into the valley,

taking in supplies for the still. This seems to have been principally his part in the maintenance and operation of the still. It does not appear that he was interested in the cattle. He made his last trip on Saturday, the day immediately prior to the Sunday of the homicide. He was then accompanied, as he had been on other occasions, by Miller, a soldier from the United States army post at Vancouver, who was absent from military duty on a furlough, and claiming to be with Ted only as a matter of hunting and fishing recreation. They passed through Hockinson, stopping for a short time at Luther's place; Ted claiming to want to see his grandfather who lived there. Luther and Ellis were then in the Dole valley. Miller, while on the stand as a witness for the prosecution, testified as follows:

"Q. What did you do and what did Ted do there [Luther's place] ? A. We fooled around the house; talked about hunting, etc., and took a rifle down and I looked at it and put it in the car to take up there. Q. Where was this rifle in the house? A. As you go in the door it was hanging on the right hand side. Q. Did you notice if there were other guns there at that time? A. There was a couple or three guns. Q. What else, if anything, did you take? A. Some shells. It was a Savage rifle; I would say 30-30 or something like that. Q. What was done with this gun after it was put in the car? A. Taken up to the house in the hills. Q. And left there? A. Yes. Q. How long did you and Ted stay at the house that time [meaning the Erion house in Dole valley] ? A. About thirty or forty minutes. Q. What did you do? A. Hauled a load of wood. Q. You testified that Edwin [brother of Luther and Ellis] was the only one you saw at the house at that time. After you helped him get that load of wood what did you do? A. Came on straight for Vancouver. Q. Did you see any other member of the family at that time? A. Yes. Q. Which one? A. Luther. Q. After you had started? A. Yes. Q.

What was Luther doing at the time you saw him? A. Leading a horse. Q. What did you do after you saw Luther? A. Stopped and talked with him. Q. Did you hear what was said on that occasion? A. Not much of it. Q. What were you doing? A. I was out fooling around with the horse. Q. Did you hear part of the conversation? A. Yes. Q. What did you hear? A. Ted asked Luther if that was his rifle and something about the marks on it. Q. Remember what he said about the marks? A. No, sir. Q. Was there any talk about taking the gun out with you before you got there [Luther's place]? A. Not as I remember. Q. Anybody tell you to bring the gun out? A. No, sir. Q. How came you to take the gun? A. Taking it to hunt with. Q. Had Luther or Ellis ever said anything to you about a gun? A. No, sir. Q. Did you know whose gun you were taking at the time? A. No, sir. Q. You say you took the gun and put it in the machine? A. Yes, sir. Q. What became of the gun after you got to the Erion place? A. Gave it to Edwin. Q. You came back with Ted that Saturday evening? A. Yes, sir.''

The testimony of Ted, touching the taking of the gun from Luther's place at Hockinson to the Erion place on that Saturday and the purpose of so taking it, is principally as follows:

''Q. Did you go back there [Erion place] on Saturday after you got home from the Thursday trip? A. I did. Q. Who went with you at that time? A. Miller. Q. Did you go by the Hockinson place then? A. We did. Q. At whose place did you stop? A. Luther Baker's. Q. Who was there? A. My granddad. Q. What, if anything, was taken with you from there? A. A rifle. Q. Who took it? A. Miller asked if I thought it would be all right to take the gun. I said I imagined so; it was generally all right if we wanted to use anything to use it and keep it in the same condition and return it. So he asked what I thought and I said I thought it would be all right. He took the gun and put it out in the car. Q. Was anything said about the gun before you got there? A. Nothing. Q. Did

you go there for the purpose of getting a gun? A. No; we was just going by there and stopped to see how grandad was. Q. What is the fact as to whether Luther or Ellis had told you to get a gun? A. They had not. Q. Had either of these men requested you to bring up the gun or talked to you about the gun. A. No. Q. When you got up there [Erion place] what was done with the gun? A. Ed was standing beside the car and Miller handed it to him when he got out. Q. How long did you stay there that time? A. Oh, it was probably an hour something like that. Q. Where did you go from there? A. Straight back to Vancouver; arrived there along in the evening, probably six or seven o'clock.''

Edwin's brief testimony is in harmony with this testimony of Miller and Ted. There is in the record no other direct evidence or testimony, touching the taking of the gun by Ted or Miller from Luther's place at Hockinson to the Erion place on the Saturday immediately preceding the Sunday of the homicide, nor touching the purpose of the taking of the gun there at that time. We have noticed this testimony given by Miller, Ted and Edwin to this extent particularly as bearing upon the question of Ted's alleged intent to encourage or aid the killing of any officer who might seek to interfere with the operation of the still. Ted was not anywhere near Dole valley after returning to Vancouver the Saturday evening preceding the Sunday of the homicide. He was in Vancouver at the time of the homicide. This the prosecution concedes.

On Sunday morning, May 22, 1927, the sheriff of Clark county, Lester M. Wood, sent his deputies Kemp, Johnson and Jones into the Dole valley to make investigation and search for illicit liquor manufacture, more particularly to find a still which the sheriff suspicioned was in operation in some concealed place in or near Dole valley. These deputies arrived at Hus-

ton's camp at about ten o'clock in the morning, parked their car and commenced their search.

They soon discovered the footlog across Rock creek just east of Huston's camp, crossed over and followed the foot trail from the crossing log northeasterly up the hill to where it joined the horse trail leading easterly from the ford. They then followed the horse trail easterly some one hundred feet, where they discovered the trail leading off to the north down the hill towards Smith creek and the still we have mentioned. They walked single file because of the narrow trail and brush close to it on each side. They had proceeded to a point where they saw a canvas covering over the still about twenty-five feet ahead of them.

Just then Ellis suddenly appeared close to the still, standing with a rifle pointed directly at the deputies. He ordered them to stop and get out of there. In obedience to that order they turned and walked back to the horse trail, Ellis following them, turning thence west on the horse trail, Ellis still following them. Arriving at the junction of that trail with the foot trail leading to the footlog crossing, they were about to go down the foot trail, but Ellis ordered them to go down the horse trail towards the ford. They obeyed, Ellis following them to the ford. Coming to the ford, they protested they could not cross on foot there, but he ordered them to wade across, which they did. When they had crossed and reached the west bank of the creek, Ellis, standing on the east bank, gave them final orders to keep away. All the time Ellis so followed the deputies, he menacingly held his rifle ready for use to enforce his orders. When the deputies had crossed the creek and Ellis had given his final order, he disappeared in the brush on the east side of the creek.

The deputies then returned to their car at Huston's camp and there consulted as to their future action. While there, and a very short time after leaving Ellis at the ford, Luther was seen a short distance south of Huston's camp, going in a direction from the still and the creek towards the Erion place, the Bakers' headquarters. Luther's pants were wet, as if he had recently waded the creek. A few minutes later one of the deputies met and talked casually to Luther, nothing being said, however, about the recent affair with Ellis. This was how the deputy had good opportunity to notice that Luther's pants were wet, such as to indicate his recent wading in water.

The deputies then concluded to get in communication with Wood, the sheriff, at Vancouver. This deputy Johnson then did by going to a telephone, back a way on the road on which they had come from Vancouver. In response to this call Wood hurriedly drove with another deputy to Huston's camp. The situation being then explained to Wood, he and his deputies Johnson and Miller pinned their stars on the outside of their coats, Wood carrying a shotgun, Johnson a rifle, and each one carrying a revolver in the usual manner, went to the ford, crossed and proceeded up the horse trail towards the still.

When they arrived a short distance west of the junction of that trail with the foot trail leading up from the footlog crossing, Luther suddenly appeared in the trail about sixty feet ahead of them with a rifle, and immediately, without warning, fired directly at them, as the jury might well believe and manifestly did believe. Wood then fired at Luther with his shotgun, two of the small shot therefrom striking Luther in his leg. Luther continued firing, firing in all three times, one of the shots from Luther's rifle striking Wood in his side just above the hip and passing diagonally

down nearly through his body to just below the opposite buttock, from which wound he died in a few moments. One of the deputies also, after the firing commenced, fired upon Luther, but Luther escaped without injury other than the two small shot entering his leg, which did not at all incapacitate him.

Wood called out to Luther before the shooting commenced that he was the sheriff. Luther claims that he did not hear anything from the direction of Wood and the deputies, other than something sounding to him like "Hello;" that he did not even see Wood or any of the deputies; that the firing commenced from their direction toward him, and he, being hit, then fired three times into a cloud of smoke from which the firing appeared to come.

The theory of Luther's defense is purely self-defense, though when first arrested he claimed that he knew nothing of the shooting occurring at the time Wood was shot. Immediately following the shooting, Luther disappeared in the brush and returned to the Erion place, hiding his rifle on the way, which has not been found since then. Luther and Ellis were arrested by the deputies that evening at the Erion place. Ted was soon thereafter arrested at Vancouver.

It is contended in behalf of Ted that the evidence fails to support the verdict and judgment rendered against him, and that the trial court erred in refusing to so decide as a matter of law and accordingly withdraw the case as to him from the consideration of the jury, in response to appropriate timely motions made in that behalf by his counsel. We have seen that there is no evidence suggesting intent or premeditation on the part of Ted to effect the death of anyone who might interfere with the operation of the still in which he and the others were interested, other than, as claimed by the prosecution, his interest in the

still and his taking or causing Miller to take the rifle from Luther's place at Hockinson to the Erion place in Dole valley, on the Saturday immediately preceding the Sunday of the homicide.

The interest of Ted in the still, it may be conceded, suggests an intent on his part to protect and encourage his associates to protect the still and its operation; but clearly, we think, the mere interest in the still on the part of Ted does not suggest his sanctioning or encouraging the actual killing of officers intruding with a view of enforcing the laws against unlawful manufacturing of and traffic in intoxicating liquor. The taking of the rifle by Ted and Miller from Luther's place at Hockinson to the Baker headquarters at the Erion place may suggest the possibility of an intent, on the part of Ted, that it or other firearms should be used to kill officers interfering with the still and its operation; but we think such suggestion can not rise to the dignity of a probability.

These two circumstances, and we find none other of any consequence disclosed by the evidence which can in any substantial degree be considered as pointing to an intent on the part of Ted to aid or encourage an act of homicide such as was committed by Luther, we feel constrained to hold, do not constitute any substantial evidence of Ted's entertaining any such intent as could make him guilty of murder as the result of Luther's shooting Wood. However certain Ted's guilt of manufacturing intoxicating liquor may be, in the operation of the still—not a felony but only a gross misdemeanor, Rem. Comp. Stat., §§ 2253, 7338—we are of the opinion that he is not proven guilty of murder in the first degree in connection with the shooting of Wood by Luther with any such possible certainty as to sustain a finding by the jury of his being guilty of murder. We conclude that the trial court should have

so decided as a matter of law and should have accordingly withdrawn the case as to Ted from the consideration of the jury.

■ It is contended in behalf of Ellis that the evidence fails to support the verdict and judgment rendered against him, and that the trial court erred in refusing to so decide as a matter of law and accordingly withdraw the case as to him from the consideration of the jury, in response to appropriate timely motions made in that behalf by his counsel. This contention, we are of the opinion, cannot be sustained. Ellis' interest in the still and its unlawful maintenance; his menacing action in its protection in driving the deputies from it, not only from its immediate presence, but following them clear down the horse trail to the ford, forcing them to wade the creek, and his final warning and menacing threat to them, all while carrying in readiness his deadly rifle; Luther's shooting Wood, premeditatedly, as the jury found, very soon thereafter, on the same trail but a short distance from the still, upon Wood's approach to it with his deputies; and the other surrounding circumstances pointing to a common purpose on the part of Ellis and Luther—we think, argue sufficiently convincingly that the question of the guilt of Ellis became a question of fact for the jury to decide, and not a question for the court to decide as a matter of law. We conclude that the trial judge did not err. in refusing to take the case from the jury as to Ellis.

■ The sufficiency of the information was challenged by timely motions and demurrers made in behalf of the defendants, particularly in charging the defendants with premeditation and design

" . . . to effect the death of Lester M. Wood, sheriff of Clark county, and any other officer who might attempt to inquire into and interfere with the

illicit liquor operations then being carried on by the defendants.''

It is argued in behalf of the defendants that this is not a sufficiently specific charge as to the person against whom the design and intent of the defendants was directed. It seems to us that the information is at all events sufficiently specific in charging the intent as directed against Lester M. Wood, the sheriff, if he should attempt to interfere with the illicit liquor operations of the defendants. This, it seems to us, is as far as we need go in our present inquiry. It was well said by Judge Sims, speaking for the supreme court of appeals of Virginia in *Williams v. Commonwealth*, 128 Va. 698, 104 S. E. 853, as follows:

''This intent to kill need not be directed against any specific person. If it be an intent to kill any person who may attempt a certain thing, and one is killed because he attempted that thing, the intent is the same as if it were directed against that specific person.''

It is further contended in behalf of the defendants that the information is defective in that it charges two crimes, homicide and also the violation of our intoxicating liquor prohibition laws. It seems to us not to do so, because of its manifest insufficiency in charging violation of our liquor laws looking to punishment for such violation. In so far as the language of the information relates to illicit or unlawful liquor operations, it does so only incidentally to the intent charged against the defendants.

Luther moved for a trial separate from the trial of Ellis and Ted, because of his defense being different from the defense of Ellis and Ted; while Ellis and Ted jointly moved for a trial separate from the trial of Luther, because of their defense being different from the defense of Luther. There was no

showing at that time made to the court as to just what their respective defenses would be upon the trial; it being alleged only that they were different, that different rules of evidence would apply and that they would, by all being tried together, be deprived to some extent of peremptory challenges to jurors. These motions were overruled, and this is now claimed to be to their prejudice. Our criminal procedure statute provides (Rem. Comp. Stat., § 2161) as follows:

"When two or more defendants are indicted or informed against jointly, any defendant requesting it may, in the discretion of the trial judge, be tried separately."

This provision has been recognized as giving to the superior court very large discretionary powers in disposing of applications for separate trials of defendants who are jointly charged. *State v. Franklin,* 124 Wash. 620, 215 Pac. 29; *State v. Ditmar,* 132 Wash. 501, 232 Pac. 321. This seems to be the general rule under similar statutory provisions. 8 R. C. L. 167. Clearly, we think there was nothing before the court at the time it so ruled, indicating in the least an abuse of discretion in so ruling upon these motions for a separate trial. Indeed, the later proceedings in the case, including the trial, strengthen the view that the superior court did not abuse its discretion in so ruling, particularly as to Luther and Ellis. We, of course, are not now concerned with Ted's claim of separate trial since we decide that he shall be discharged.

On June 27, 1927, as we have already noticed, the case was set for trial, to commence July 25, 1927. On July 8, 1927, that being seventeen days before the day set for trial, the prosecuting attorney served upon counsel for the defendants a list of the witnesses the state intended to use upon the trial. Thereupon counsel for the defendants objected to the service and fil-

ing of this list of witnesses by the prosecution; asserting that the list was not timely filed and the want of sufficient time "to make proper investigation and prepare for trial." The matter being heard, the court entered its order overruling these objections and sanctioned the serving and filing of the list of witnesses by the prosecution. The argument here made in behalf of defendants is rested upon the provision of Rem. Comp. Stat., § 2050, as amended by ch. 150, Laws of 1925, Ex. Ses., p. 420, reading as follows:

"At the time the case is set for trial the prosecuting attorney shall file with the clerk a list of the witnesses which he intends to use at the trial and serve a copy of the same upon the defendant, and within five days thereafter the defendant shall file with the clerk and serve upon the prosecuting attorney a list of the witnesses which the defendant intends to use at the trial. Either party may add such additional names at any time before trial as the court may by order permit, . . ." Rem. 1927 Sup., § 2050.

No particular showing was made to the court at that time in behalf of the defendants, they relying upon the considerable number of witnesses proposed to be used by the state, forty-six in all, a number of which, however, were witnesses proposed to be used by the defendants themselves; and relying upon what was conceived to be the undue limitation of time preceding the date for which the trial was fixed; which period, we have noticed, gave the defendants sixteen whole days for investigation before the trial. We are unable to see an abuse of discretion on the part of the trial court in sanctioning the serving and filing of this list of witnesses. The situation is as if the court had then re-set the case for trial on July twenty-fifth, which would have been seventeen days in the future. This, we think, would not have been an abuse of discretion under the circumstances here appearing. Again we

say that later proceedings in the case, including the trial, strengthen the view that the superior court did not abuse its discretion in so ruling. It is not claimed that the witnesses so proposed to be used by the state were not readily accessible in Clark county or in the city of Portland within a very few miles of Vancouver, the county seat of Clark county. Indeed, the record warrants the conclusion that they were all so accessible.

Claims of error are made in behalf of defendants that the trial court gave to the jury certain erroneous instructions and refused to give to the jury certain requested instructions proposed by their counsel. By one of the court's instructions the jury was told, touching the alibi defense of Ellis and Ted, in part, as follows:

"It is immaterial in this case whether or not the defendants Ellis and Lewis 'Ted' Baker were present at the time of the alleged shooting. These two defendants are charged with having entered into an agreement or conspiracy to kill Lester M. Wood or any other officer, as set out in the information, and if you find beyond a reasonable doubt that they did enter into such an agreement or conspiracy with Luther Baker, and that Luther Baker in pursuance of such, agreement or conspiracy did kill Lester M. Wood as charged in the information, then it would be your duty to find the defendants Ellis Baker and Lewis 'Ted' Baker guilty of murder in the first degree, even though they were not actually present at the time of the alleged killing."

It is argued that this language erroneously uses the words "agreement or conspiracy," while the information does not charge a conspiracy on the part of the several defendants. We think the jurors must have certainly understood that the trial judge's use of the words "agreement or conspiracy" in this connection

meant simply the alleged unlawful common purpose of the defendants. It seems plain to us that the use of these words in this connection did not constitute error in the least prejudicial to the defendants.

Several requested instructions were proposed by counsel for the defendants touching Luther's self-defense, wherein the court was asked to instruct the jury somewhat extensively upon the law of arrest, particularly as to an officer's authority and want of authority to arrest without a warrant; this upon the theory that Wood did not have any warrant for the arrest of Luther or any of his associates; that the liquor operations in question in no event amounted to any offense more serious than a misdemeanor; and that Wood had no knowledge of the commission of any such misdemeanor or any other offense by Luther as would warrant their arresting him without a warrant.

We are unable to see that the refusal of the court to give these requested instructions constituted error to the prejudice of any of the defendants. Of course, Luther was entitled to full and fair instructions touching the law of self-defense; and, of course, the other defendants were entitled that the jury be so instructed in Luther's behalf; since if Luther was not guilty because of his rightful exercise of self-defense, the other defendants could in no event be guilty. But the jury were fully and fairly instructed by the court on every possible phase of Luther's self-defense which the evidence called for. It may be conceded for argument's sake that, just before the shooting, the calling out to Luther by Wood evidenced an intent on the part of Wood to arrest Luther; but Luther did not hear or understand any such call. Luther's testimony, in response to direct examination by his own counsel, as to what then occurred, is as follows:

"Q. Mr. Baker, when you struck that trail you may tell the jury just what happened and how it happened. A. I was going south, that is, in a southerly direction. Q. What direction was at your right hand when you entered the trail? A. To the west. Q. You may tell the jury just what you did, what happened when you crossed the trail. A. I came up through the brush and stepped into the trail, the horse trail, and I heard someone, heard some voices and it sounded as if behind me; it sounded as if someone was hollering, Hello, there. I thought it sounded directly behind me and I turned and looked back the way I had come and instantly when I turned there were two shots fired, two shots struck my leg, two separate shots. I turned in this direction down the trail facing west and looked down the trail and saw smoke there in the trail. I raised my rifle and shot three shots and my rifle went empty; only had three shots in it. I turned then and went straight ahead the way I was travelling before and struck straight on toward camp. Q. Mr. Baker, how many shots were fired before you returned the fire? A. Two shots. Q. Did you know who was shooting at you? A. No, sir. Q. Did you see anyone? A. No, sir; I did not. Q. Did you see anyone at all when you shot? A. No, sir; I shot into the bank of smoke.''

Now, it has not been in the least claimed by the prosecution at any stage of the proceedings of this case, including the trial thereof, that Wood, as sheriff, or any of his deputies had any right of protection as officers of the law in the least degree superior to what they possessed as private individuals, in so far as Luther's right of self-defense became a proper subject of inquiry in this case. It is not claimed in behalf of Luther or the other defendants that the trial court's instructions were other than full and fair on the subject of Luther's self-defense, apart from the failure of the trial court's instructions to make reference to the fact that Wood and his deputies were officers of

the law. The favorable effect of the instructions given by the court touching Luther's self-defense was not lessened by any suggestion therein that Wood or his deputies had any rights whatever in the least impairing Luther's right of self-defense by reason of their being officers, or by reason of their there being engaged in some official duty. We are of the opinion that the refusal to give these instructions was not error to the prejudice of either defendant.

In this connection some further contentions are made in behalf of the defendants that the court erred to their prejudice in refusing to give requested instructions expounding the law touching the degree of force which an officer might make in effecting an arrest, particularly as to the rightful degree of force which would vary according to the degree of the offense for which the arrest was sought to be made. We think what we have already said sufficiently answers this contention. We conclude that the refusal of the court to give these requested instructions was not error to the prejudice of any of the defendants.

Some other claims of error are made directed against certain trial rulings of the court. These claims are presented to us practically without argument. This, however, being a capital case, we have carefully considered them. We think none of them are of sufficient merit to call for more than our saying that we regard them as wholly without substantial foundation. We conclude that Luther and Ellis have had a fair trial, free from prejudicial error in so far as can be determined from the record before us.

The judgment of the superior court rendered against Lewis "Ted" Baker is reversed and the cause as to him shall be dismissed. The judgment of the superior court rendered against Luther Baker is affirmed. The

judgment of the superior court rendered against Ellis Baker is affirmed. The cause is remanded to the superior court for further proceedings accordingly.

MAIN, MITCHELL, ASKREN, and HOLCOMB, JJ., concur.

FRENCH, J. (concurring)—I concur in that part of the foregoing opinion affirming the conviction of Luther Baker. I am unable to agree with that portion of the opinion approving the instruction which reads as follows:

"It is immaterial in this case whether or not the defendants Ellis Baker and Lewis 'Ted' Baker were present at the time of the alleged shooting. These two defendants are charged with having entered into an agreement or conspiracy to kill Lester M. Wood or any other officer as set out in the information, and if you find beyond a reasonable doubt that they did enter into such an agreement or conspiracy with Luther Baker and that Luther Baker in pursuance of such agreement or conspiracy did kill Lester M. Wood as charged in the information, then it would be your duty to find the defendants Ellis Baker and Lewis 'Ted' Baker guilty of murder in the first degree, even though they were not actually present at the time of the alleged killing."

As I read the information in this case, there is contained therein no charge of agreement or conspiracy; no charge of aiding or abetting. I think the defendants Ellis and "Ted" Baker were warranted in coming into court and presenting an alibi as a complete defense to the charge contained in the information. It is true that under our statute one who counsels, assists, aids and abets in the commission of a crime may be charged as a principal, but in all of our previous holdings, in so far as I have made an examination of the cases, where the state expected to prove one guilty as a principal because of aiding and abetting, the charge of aiding and abetting has been contained

in the information. *State v. Golden,* 11 Wash. 422, 39 Pac. 646; *State v. Mann,* 39 Wash. 144, 81 Pac. 561; *State v. Klein,* 94 Wash. 212, 162 Pac. 52; *State v. Vane,* 105 Wash. 421, 178 Pac. 456.

Probably the most perfect defense to a murder charge such as is contained in this information is an alibi, and as I read the record this was the defense relied upon by Ellis Baker and "Ted" Baker. I think the evidence is conclusive in this case that the three defendants were engaged in illicit liquor operations, and that if the state had charged Ellis and Lewis "Ted" Baker under the aiding and abetting statute, there is probably sufficient evidence to go to the jury as to both of them. Under the information as set out in the majority opinion, I think the giving of the instruction above quoted constitutes reversible error, and that a new trial should be granted Ellis Baker and Lewis "Ted" Baker.

TOLMAN, J. (dissenting)—I concur in the majority holding that the evidence against "Ted" Baker was insufficient. I also concur in the dissent by Judge French, so far as it holds that there should be a reversal as to Ellis Baker for the reasons he has given.

I am, however, wholly unable to agree that Luther Baker has had a fair trial in one important and vital particular.

It is not seriously claimed that the sheriff was armed with, or acting under, a warrant, at the time of the shooting and the jury might well have found that he was not. According to the testimony of Luther Baker, as to the truth of which the jurors were the sole judges, he was fired upon and wounded in the leg before any demand or notice of any kind was given to him, and that by a person, or persons, wholly unseen, and whose presence, until that instant, was

wholly unknown to him. With this testimony in mind, the defense requested instructions properly defining the duties and powers of a sheriff in making an arrest without a warrant, and defining also the right to resist an unlawful arrest; all of which were refused, and the usual instruction on self defense was given in lieu thereof.

Technically, the instruction on self defense was proper, but in my opinion it was wholly insufficient under the peculiar circumstances. It is a matter of common knowledge that an ordinary individual firmly believes that a sheriff may rightfully arrest anyone suspected of an offense anywhere, at any time, by authority of his suspicions alone, and therefore the stock instruction on self defense, based on a design of the person slain to commit a felony, or to do great personal injury, wholly failed to bring to the attention of the jury the vital question upon which the defense relied.

In my opinion it was prejudicial error to refuse the requested instructions defining the powers and duties of the sheriff and the right of the accused to defend himself against unlawful arrest.

For these reasons I dissent.

BEALS, J. (concurring) — I concur with Judge Tolman, save that in my opinion there was sufficient evidence to go to the jury as to "Ted" Baker.

FULLERTON, C. J. (dissenting)—I am unable to concur in all that is said in the majority opinion, or all that is said in the separate opinions of the dissenting members of the court. I think the information sufficient to charge each and all of the defendants with murder in the first degree, and had it been shown that each and all of them actually participated in the acts which resulted in the death of Lester M. Wood, no

fault could be found either with the trial proceedings or with the verdict of the jury. But the trouble is that the evidence failed to show an active participation by all of the defendants in the acts resulting in the death. In fact, the evidence conclusively showed that only one of the defendants actively participated in the immediate act, and conclusively showed that the others, if they were connected with the act at all, were connected with it as accessories before the fact. The question before the court is therefore, as I view it, Can a defendant who is charged with actively participating in an offense be convicted by showing that his act in connection therewith is that of a counsellor, an aider or an abetter?

The question is not a new one in this court. In the early case of *State v. Duncan,* 7 Wash. 336, 35 Pac. 117, 38 Am. St. 888, it was held that a person charged as a principal in the commission of a crime could be convicted by showing that he counseled, aided and abetted its commission. But the case was expressly overruled in *State v. Gifford,* 19 Wash, 464, 53 Pac. 709. In the course of the opinion in that case, the court called attention to art. 1, § 22, of the state constitution, which provides that a defendant in a criminal prosecution has the right to demand the nature and cause of action against him, and said, in substance, that any law or rule of procedure which did not grant to the defendant this right would be in violation of the constitution, and that to charge a defendant as a principal and prove that he was an aider or abetter was a denial of the right. In so far as I am aware, this court has not departed from this doctrine, and I think further it has been the uniform practice of the prosecutors of the state since the case of *State v. Gifford, supra,* to charge an accessory before the fact with

having aided and abetted in the commission of an offense, where it was known in advance that the proofs would show that such was his connection with the offense. At least, I cannot now recall a case where it was not done.

If I am correct in my views, it follows that all of the evidence tending to show that Ellis Baker and Lewis Baker counseled, aided and abetted in the commission of the offense of which they were convicted was inadmissible, and that there was a mistrial because of its admission.

I think too that the instruction quoted in the majority opinion, and requoted by Judge French, is also erroneous. The information no more charges that the defendants agreed and conspired to kill Wood, the sheriff, than it charges that they counseled, aided or abetted in his killing. I am aware that the majority say that the court's words meant no more than "the alleged common purpose of the defendants." But aside from the fact that this is to me a strained construction of the court's language, I can find no allegation in the information that the defendants had a common purpose to commit a murder. It is conceivable that the language of the information charges that each of the defendants had at the same time a premeditated design to effect the death of any person who should interfere with them while they were engaged in illicit liquor operations, but it falls far short of charging that they had a common purpose so to do. In short, the information in my opinion does not charge either an agreement or conspiracy to commit an offense, or charge that the offense was committed by one of them and that the others counseled, aided and abetted therein. Without one or the other of these charges, proof of agreement and conspiracy, or of counselling, aiding or abetting was inadmissible.

Nor can I agree that the evidence did not justify the conviction of Lewis "Ted" Baker. He was not only one of the owners of the illicit still, but he had a voice in the selection of the place of its location, carried to it the raw material out of which the whiskey was manufactured, and he disposed of the whiskey after it was so manufactured. I think too that the evidence justifies the inference that he carried to the vicinity of the still the gun with which the sheriff was killed, and justifies the inference that the gun was taken to the still as an instrument to be used in its protection. When it is remembered that Luther Baker, who did the actual killing, had no connection with the still other than that of an assistant operator and a possible sharer in its gains, it is going too far, in my opinion, to say that there is no competent evidence to show Lewis "Ted" Baker was connected with the means adopted for the protection of the still.

In my opinion there should be an affirmance as to Luther Baker and a reversal as to Ellis Baker and Lewis "Ted" Baker.