[No. 20693. Department One. August 23, 1927.]

THE STATE OF WASHINGTON, *Respondent,* v. TOM EVANS, *Appellant.*[1]

[1] HOMICIDE (23, 28, 37, 48)—INFORMATION—PREMEDITATION—COMMISSION OF OTHER OFFENSE—EVIDENCE OF PREMEDITATION—OTHER OFFENSE PART OF CRIME—ADMISSIBILITY. Where the evidence indicates that a killing was the first of the immediate acts constituting the crime, and that the robbing was secondary, the state may properly charge that the killing was done with a premeditated design to effect the death, and may show a robbery immediately following as part of the *res gestae;* and the same is not inadmissible because it tends to show a killing regardless of premeditation while engaged in committing or attempting to commit a crime, under Rem. Comp. Stat., § 2392.

[2] SAME (42, 48)—EVIDENCE—MOTIVE—OTHER OFFENSE PART OF CRIME. In such a case the effect of evidence of the robbery should not be restricted to the sole purpose of identifying accused with the crime, since it has a direct bearing upon the motive for the killing.

[3] CRIMINAL LAW (123) — EVIDENCE — COMPETENCY — SEARCHES — WRONGFULLY OBTAINED. Evidence obtained in the search of accused's room without a warrant is not, for that reason, inadmissible, where accused, while on his way to his room, had been arrested for a heinous crime.

[4] SAME (109)—WITNESSES—CONVICTION OF CRIME—EVIDENCE—ADMISSIBILITY. Under Rem. Comp. Stat., § 2290, providing that a prior conviction may be shown for the purpose of affecting the credibility of accused, testifying in his own behalf, the conviction is not proof of guilt, and it is not error to exclude evidence of the accused to the effect that he was not guilty of the crime of which he was convicted.

[5] SAME (109). Where, on cross-examination of the accused, he admits a prior conviction of a crime, it is not unfair cross-examination to the prejudice of accused to inquire as to the nature of the offense of which he was convicted.

[6] SAME (244)—TRIAL—MISCONDUCT OF COUNSEL—CURE BY WITHDRAWAL. The prosecutor's statement of improper evidence is cured by withdrawal of the evidence and directing the jury to disregard it, where the offense was not so gross as to be incapable of cure by withdrawal.

[1]Reported in 258 Pac. 845.

[7] SAME (229)—RECEPTION OF EVIDENCE—SCOPE OF EVIDENCE IN RE-
BUTTAL. Where, in a murder case, the defense brought out the
fact that another had a motive and may have threatened to kill
the deceased, it is not error to allow the state to show on re-
buttal that such third person was not in the vicinity on the day
preceding or on the day of the crime.

[8] SAME (238)—TRIAL—CONDUCT OF COUNSEL—COMMENTS AND AR-
GUMENT. Upon a charge of murder, in which it could be legiti-
mately drawn from the evidence that the accused was a "red-
handed murderer," it cannot be said that the prosecutor was
guilty of improper conduct in so referring to the accused, espe-
cially where the record does not show the connection in which
the words were used.

[9] APPEAL (306)—STATEMENT OF FACTS—SETTLEMENT—DETERMIN-
ING FACTS AT SETTLEMENT—DEATH OF REPORTER. Where the of-
ficial court reporter died before transcribing his notes, which
could not be deciphered or a complete transcript of the evidence
made, the accused is thereby not entitled to a new trial, where
his substantial rights were preserved by a statement of facts
made from trial notes of counsel and the recollection of the
trial judge, certified by him to contain all of the material facts,
matters, and proceedings occurring at the trial, not already a
part of the record.

Appeal from a judgment of the superior court for
Pierce county, Chapman, J., entered January 16, 1926,
upon a trial and conviction of murder. Affirmed.

*Lloyd & Croteau* and *C. D. Cunningham,* for appel-
lant.

*J. A. Sorley, T. F. Ray,* and *J. W. Selden,* for re-
spondent.

FULLERTON, J.—The appellant, Evans, was tried in
the superior court of Pierce county for the crime of
murder in the first degree, was found guilty by the
jury as charged, and was sentenced to the state peni-
tentiary for the term of his natural life.

The appellant was found guilty of the murder of
one Victor Nelson. Nelson was, on November 5, 1925,
the date of his death, ostensibly conducting a rooming
house in the city of Tacoma. His principal business

was the illicit sale of intoxicating liquor, and his place was a general resort for persons who made use of such liquors. The rooms occupied by Nelson were on the second floor of a building, which faced upon a public street of the city named, and extended back to the south from the street some one hundred feet towards an alley. A hallway, three feet wide, extended through the center of the building for its full length, on each side of which were a series of rooms, ten in number. The room in the front of the building in the northeast corner was fitted up as a living room. Next to it, on the south, was a room called the ''drinking room.'' In the extreme southeast corner was a room fitted up apparently as a kitchen, and immediately north of that, on the same side of the building, was a room called for the purpose of identification Nelson's private room. The private room contained a bed, some shelving, and possibly a chair or two. It had two doors, one leading to the hallway and the other into the kitchen. The remaining rooms were fitted up as sleeping rooms. There was a stairway on the west side of the building, ascending from the street to a hallway which extended east to the main hallway. On the back of the building was a porch, and a stairway led from this porch down to the alley.

The appellant came to the city of Tacoma some ten days before the death of Nelson. He engaged a sleeping room at the Vendome hotel. He found work with a cornice and roofing company, for whom he worked for three or four days. The work was intermittent, because of the inclement weather. He first went to Nelson's place on the afternoon of November 4, 1925. He went there in the company of another person, who introduced him to Nelson. He returned alone on the next day in the early afternoon, staying until the early evening. On this visit he was served with liquor by

Nelson, taking some three or four drinks. On leaving the place, he went to his room at the hotel, took an extra suit of clothes that he had therein to a pawn shop, and pawned it for eight dollars, and returned to Nelson's place, reaching it between 7 and 8 o'clock. At the time of his arrival, no one was visibly at the place other than Nelson and a regular lodger by the name of Sheehan. Later on, a man by the name of Johnson came in, and later on two other persons. The latter were friends of Johnson, and the four of them, that is, Johnson, his two friends and the appellant, sat in the drinking room and were, from time to time, served with drinks by Nelson. Johnson seems to have been a stranger in the city and had a sleeping room at the place. The other two were residents of the city. As midnight approached, Johnson went to bed. The other two, concluding that they were too drunk to escape the police, if they left the place, asked Nelson for a room and were shown one in which there was a bed. They both lay down on the bed without removing their clothes. Sheehan had been in the drinking room during the early part of the evening, but was not drinking, and retired to his room at about 10:30 o'clock.

About midnight, or shortly thereafter, Sheehan, whose rooms were across the hallway from the room we have described as Nelson's private room, was aroused by pistol shots. He did not then recognize them as such, but they were to him noises sufficiently strange as to cause him to get up and open the door of his room leading into the hallway. He saw the appellant standing near the doorway leading from the kitchen into Nelson's room, and inquired of him where Nelson was. The appellant answered that Nelson was dead, and told him to go into Nelson's room and turn on the light. There was no light in Nelson's room, a

fact which Sheehan knew. He then procured a match from his own room and went into the room of Nelson, where he found Nelson lying on the floor. He stooped over to examine him, when the appellant fired two shots from a pistol into Sheehan's face. The appellant then fled, leaving the building by the back stairway. Sheehan followed and raised an alarm. The city police soon appeared, and Sheehan was able to give them a description of the appellant. The appellant was shortly thereafter arrested, and there was taken from his person at the time of his arrest an automatic pistol, which subsequent investigation showed was the pistol from which the shots were fired that killed Nelson and the pistol from which the shots were fired that struck Sheehan. There were taken from his person, also, a gold watch and a part of a watch chain, with a bunch of miscellaneous papers, that belonged to Nelson. There was a woman, a consort of Nelson, somewhere in the rooms at the time of the shooting, who heard the shots. She testified that an interval of a few seconds followed the first shot, and that the other two were fired in rapid succession. She, also, aided in giving an alarm by screaming and calling for help.

Nelson was killed by a shot fired from a pistol placed close to the back of his head; the ball entering at the base of the brain and ranging upwards. The shot, so the medical expert testified, was instantly fatal. The wounds Sheehan received were mere flesh wounds.

Nelson kept no liquor in either the living or the drinking room. When drinks were ordered by his customers, he would go down the hallway to the back of the building to procure them, and would bring them to the customers in jelly glasses. There is, of course, no direct evidence, from the viewpoint of the state, of the happenings between the time Johnson and his companions went to bed and the time the appellant was

discovered by Sheehan. The inference is strong, however, that the appellant ordered a drink after the persons mentioned went to bed, followed Nelson down the hallway when he went to procure it, and shot him as he entered his private room.

The foregoing is taken from the evidence which the jury were warranted in believing. The appellant gave a different version of the transaction. He testified that, while he took a number of drinks during the course of the night, he was not drinking with Johnson and his companions; that he was in the living room for the greater part of the time playing a phonograph, and was so playing it when Nelson was killed; that he did not hear the shots fired that killed Nelson, but that his attention was attracted by the noise made following his death; that he stepped into the hallway to learn the cause of the noise, and saw three or four persons standing near the door to Nelson's room; that he went to the place where the persons were standing, was handed a bundle by one of them and told to "beat it;" that he left the place by the back stairway, and was endeavoring to find his own room when he was arrested by the police; and that the bundle which was handed to him contained the automatic pistol and the property of Nelson which was taken from his person.

Neither Johnson nor his companions were aroused by the shots or the tumult which followed. They were found sleeping in their respective rooms by the police when the building was entered by them sometime later.

After the appellant's arrest, he was taken to the police station, where he was questioned concerning his knowledge of the transaction. During the course of the examination, he made known the place of his room at the Vendome hotel. Officers immediately went and searched the place, finding therein a pistol holster

which fitted the automatic pistol taken from his person, and bore marks which indicated that the pistol had at sometime been carried therein.

The statutes of the state defining the different degrees of murder provide (Rem. Comp. Stat., § 2392) [P. C. § 8997] that the killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed either with a premeditated design to effect the death of the person killed, or, without design to effect death by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of, a robbery.

[1] On the trial of the cause, the state offered in evidence the articles belonging to Nelson taken from the person of the appellant at the time of his arrest; and further evidence which tended to show that the appearances of the clothing on the body of Nelson indicated that a robbery had been committed; that is to say, to show that the clothing on the body was mussed, and that the part of his watch-chain not found on the appellant at the time of his arrest, was fastened to a buttonhole of the vest that was on Nelson's body. The evidence was admitted over the objection of the appellant. It is argued in this court that the admission of this evidence was error, because it tended to show a killing in the perpetration of the crime of robbery, which was not the charge contained in the information. There is, in our opinion, evidence in the record from which the triers of the facts could well find that the purpose of the killing was to enable the person committing the act to perpetrate a robbery. Indeed, we think the evidence very conclusively shows that this was the sole purpose of the killing.

But it does not follow that the killing was done without a premeditated design to effect the death of Nelson by a person engaged in the commission of, or in the

attempt to commit, or in withdrawing from the scene
of, a robbery; nor does it follow that the accused has
not committed the crime of killing with a premeditated
design. A person can form a premeditated design to
effect the death of another for the purpose of better
enabling him to rob the person or premises of that
other, and the evidence was ample here to enable the
jury to find that such was the fact in this instance.
Nelson was killed just inside of the door of his private
room. He was shot in the back of the head, indicating
that the shot was fired by some one following him.
There was no evidence of a struggle of any kind, and
no evidence that Nelson intercepted the person by
whom he was killed, while robbing or attempting to
rob his room; nor evidence that the killing was com-
mitted while the person doing the killing was with-
drawing from the scene of a robbery. The evidence
indicates that the killing was the first of the immediate
acts constituting the crime, and that the robbing was
secondary. In such a case, the state may properly
charge that the killing has been done with a premedi-
tated design to effect the death of the person killed,
and may show a robbery immediately following the
killing by the person doing the killing, as part of its
proofs of the charge. Such acts are part of the *res
gestae*. They are a part of concomitant circumstances
which it is the province of the state to show, in order
that the triers of the facts may have the entire sur-
roundings of the case, and thus be better enabled to
determine the guilt or innocence of the accused.

[2] Nor should the evidence have been restricted,
as the appellant contends, by an instruction of the
court to the effect that its sole purpose was to identify
him with the crime. It had a broader purpose. It was
a part of the general circumstances which the jury
were entitled to weigh, with the other evidence, in de-

termining the guilt or innocence of the accused, and it had a direct bearing upon the motive for the killing.

[3] The state offered in evidence the pistol holster which we have mentioned as being found in the appellant's room at the Vendome hotel. When it was so offered, the appellant objected to its admission on the ground that it had been obtained by an unlawful search of his room. The state, seemingly confirming the validity of the objection, asserted that the search was made with the consent of the appellant. This the appellant denied, whereupon the court, in the absence of the jury, heard evidence on the question. At the close of the evidence the court concluded therefrom that the appellant had consented to the search, and admitted the holster in evidence. The appellant assigns error on the ruling of the court, and argues here that the weight of the evidence is against the conclusion of the trial court. But a review of the testimony convinces us that the court determined the question in accordance with the great weight of the evidence. There were a number of persons present when the purported consent was given, and these, with one exception, testify in accordance with the finding of the trial judge. Nor is the evidence of the witness, noted as not so testifying, a direct denial that consent was given. What was said by him on the subject appears in his testimony, when called as a witness by the appellant after the court had admitted the holster in evidence. We quote from the record the following:

"Q. (By Mr. Lloyd, appellant's counsel): Teale, before you went down to search the room of the defendant he was asked, was he not, whether or not he had anything in the room? A. Yes. Q. Whether or not there was anything to incriminate him and he expressed a willingness, did he not, that you or any other officer might go down and search his room, if you

didn't believe him? A. No, I won't say he was willing.
Q. He consented to your going, did he not? A. I won't
say that he consented."

But were it the fact that the search had been made
without the consent of the appellant, we are not willing
to hold that the search of his room was unlawful, or
the evidence obtained by the search inadmissible. A
heinous crime had been committed. The appellant was
under arrest as the perpetrator of the crime. There
was then in the possession of the officers making the
arrest persuasive evidence tending to show that the
appellant was guilty of the crime. In so far as our
examination of the cases has extended, all of the cases
hold, even those which adhere most strictly to the rule
that evidence obtained by an unlawful search is inad-
missible as evidence, that, where the accused is arrested
in his home, or place of residence, a search of the home
or place of residence may be lawfully made for evi-
dence of his guilt. In this instance, the defendant was
on his way to his place of residence when arrested, and
the fact that he was caught before he reached the place
ought not to require the application of a different rule.

[4] When the appellant took the witness stand in
his own behalf, he was asked by his counsel whether he
had theretofore been convicted of crime, and answered
that in 1912 he was convicted in Clay county, Iowa, of
a felony. He was then asked whether or not he was
guilty of the crime. To this question, the trial court
sustained an objection interposed by the state. On
cross-examination, the following question was asked
him by the state's counsel:

"You were convicted in Clay county, Iowa, of the
crime of burglary in the night time, aggravated by
felonious assault, were you not?"

To which he answered: "Yes. That is what they
said, but I was not guilty." On motion of the prose-

cuting attorney, the latter part of the answer was stricken. It is assigned that the court erred in refusing to permit the witness to protest his innocence of the crime for which he was formerly convicted, but we find no error in the ruling. The statute of this state provides (Rem. Comp. Stat., § 2290) [P. C. § 8725], that no person shall be excluded as a witness because of his conviction of crime, but that such conviction may be shown for the purpose of affecting the weight of his testimony. The proof of a prior conviction is not, under the statute, evidence of the guilt of the accused of the offense for which he is on trial. Under no rule could it be received for that purpose. It is evidence affecting his credibility as a witness only, and can be shown against a defendant only when he offers himself as a witness. The question, therefore, whether the accused is guilty of the crime for which he was formerly convicted is not material, and presents a collateral issue which the court will not inquire into. As is said by Mr. Wharton in his work on Criminal Evidence (10 ed., 3596a):

"A conviction of crime, when offered to disqualify a witness, cannot be impeached by him by proof of his innocence, since it is the law that it is the conviction that disqualifies. The same rule obtains as to convictions when admitted under statutes which permit convictions of infamous crimes to be introduced in order to discredit a witness."

[5] The next assignments of error relate to the cross-examination of the appellant by the state's attorney, which his counsel say was "so unfair and so venomous that its effect was intended and calculated not to elicit facts pertinent to the inquiry," but "to degrade and humiliate the witness." It seems to us, however, after an examination of the record, that the characterization rather overstates the offense. The

character of the questions asked is indicated by the question we have above quoted. It will be noted that the prosecuting attorney was not contented with the appellant's mere statement that he had been convicted of a felony, but went further and inquired into the nature of the felony. But this was proper cross-examination. The statute, permitting the introduction of evidence of a former conviction, permits the conviction to be shown "either by the record thereof or a copy of such record duly authenticated." It is not the rule, that a party is estopped to prove a fact by relevant evidence because of the admission of the fact by the other side. Facts, when admitted, frequently lose their probative effect, and since, in this instance, the state was permitted to show the conviction by the record of the conviction, its counsel could rightfully inquire, on cross-examination, when the appellant testified to the conviction on his direct examination, what the record contained regarding it.

[6] The state later offered in evidence what purported to be an exemplified copy of the record of the appellant's conviction. This the court at first admitted, but subsequently withdrew, because it concluded the certification insufficient. In offering the record, the state's attorney stated its contents, and it is urged that this was error. But the statement went out of the evidence with the exhibit, and the court, in its general charge, instructed the jury that evidence withdrawn or excluded by the court was not for their consideration. Whatever may be the rule elsewhere, it is the rule in this state that the improper admission of evidence can be cured by the withdrawal of the evidence and by an instruction to disregard it. *State v. Storrs,* 112 Wash. 675, 192 Pac. 984, 197 Pac. 17; *State v. Franklin,* 124 Wash. 620, 215 Pac. 29; *State v.*

*Crowder,* 132 Wash. 496, 231 Pac. 930. The same rule applies to the statements of counsel as to nature of the evidence. There may be, it is true, instances where the offense is so gross as to be incapable of cure by withdrawal, admonitions or instructions, but the record does not disclose that those here complained of are of that sort.

[7] The woman we have mentioned as the consort of Nelson, was the wife of another. The appellant called the husband of the woman as a witness in his behalf and interrogated him with reference to his relations with Nelson. The witness testified, in substance, that he had caused Nelson to be prosecuted for the crime of adultery because of his relations with his wife, that he then had a suit pending against him for $10,000 for alienation of his wife's affections, and that he would not say that he had not threatened to kill Nelson. On cross-examination, the state's attorney inquired of him whether he was in the city of Tacoma on the 4th and 5th days of September, 1925, the first being the date preceding and the second the day of Nelson's death. The court, over objection, allowed the witness to answer, and he answered in the negative. Error is assigned on the ruling of the court in this particular, but in our opinion the question and answer were properly admitted. The plain purpose of the appellant in calling the witness was to lay a foundation for the inference that the witness had a motive for killing Nelson, and thus a foundation for an argument that the witness might be guilty of the offense. Certainly, the state was permitted by cross-examination of the witness to rebut the inference, and the question propounded to him was pertinent to that purpose.

[8] It is complained that the prosecuting attorney was so far intemperate in his argument to the jury as

to require a new trial. The record shows that he, in one instance, referred to the appellant as a "murderer," and in another as a "red-handed murderer." The record, however, shows nothing of the general trend of the attorney's argument, and we are not advised of the connection in which the words were used. Two short paragraphs only are quoted from the address. It may be that, in a case where these terms would be inappropriate to the charge against the defendant, in a case where there was no justification for their use, and the attorney applied them to the defendant as mere epithets, the court would be warranted in saying that he went beyond the bounds of legitimate argument to the prejudice of the defendant. But this is not such a case. The charge was murder. The evidence on the part of the state tended very strongly to show that the appellant was guilty of the charge. There was evidence, also, from which the jury could well find that the blood of his victim was upon his person and clothing at the time of his arrest. The conclusion that the appellant was a "murderer" and a "red-handed murderer" was one that could be legitimately drawn from the evidence. It is not an instance where the attorney went beyond the evidence and made statements of his beliefs and opinions, unwarranted and unsupported by evidence. It is this latter sort of statements that the courts usually condemn, not those which the evidence reasonably supports. As we said in *State v. Peeples,* 71 Wash. 451, 129 Pac. 108:

"While intemperate assertions of opinion not based upon any evidence will never be tolerated, it is none the less in the interest of a sound public policy that prosecuting officers be permitted a reasonable latitude in argumentative deduction from the evidence."

See, also, *State v. Armstrong,* 37 Wash. 51, 79 Pac. 490; *State v. Marion,* 68 Wash. 675, 124 Pac. 125.

[9]    The evidence given on the trial of the cause was taken in shorthand by the official court reporter of the court in which the cause was tried. He became ill shortly thereafter and died before he was able to transcribe his notes. After his death, no one was found who could read the notes, and the parties were forced to make up the statement of facts from such trial notes as counsel had preserved and from the recollection of the evidence by the trial judge and counsel. The statement bears on its face evidences that it is not a complete transcript of the evidence given at the trial, and the state does not contend that it is such. For these reasons, the appellant argues that he is entitled to a new trial. But, before the days of court reporters, the method employed in this instance was the sole method employed in making up a statement, and it is not an unknown practice at the present time. It is a less convenient method to make a statement of facts in this manner than it is to make it from a transcript of the court reporter's notes, but there is no reason why any of the substantial rights of the appellant should be denied by it. In this instance, we are persuaded that they were not. The record contains a substantial outline of the testimony, and the court has certified that it contains all of the material facts, matters and proceedings occurring in the trial and not already a part of the record therein. The appellant is not entitled to more.

The judgment is affirmed.

MACKINTOSH, C. J., MITCHELL, FRENCH, and MAIN, JJ., concur.