[No. 33483. *En Banc.* August 22, 1957.]

THE STATE OF WASHINGTON, *Respondent*, v. HARVEY JOHN COLLINS, *Appellant.*[1]

[1]Reported in 314 P. (2d) 660.

*J. Houston Vanzant, Jr.,* for appellant.

*John J. O'Connell, John A. Petrich,* and *Elvin J. Vandeberg,* for respondent.

HILL, C. J.—Harvey John Collins killed Andrew K. Stolen with a samurai sword. The jury found him guilty of murder in the first degree and determined that the death penalty should be imposed. From the judgment and sentence entered on the jury's verdict, the defendant has appealed. His sixteen assignments of error will be considered seriatim.

1. *Re change of venue*: The motion for a change of venue was based upon alleged local passion and prejudice. In *State v. Welty* (1911), 65 Wash. 244, 249, 118 Pac. 9, we said:

"It must appear, before we would be justified in reviewing [reversing] the trial court's ruling, that the community has been so warped by the passion and prejudice of the newspaper articles complained of that there is danger of the trial jury being so influenced by such publication as to give heed to them rather than to the evidence in reaching a verdict. [Cases cited.]"

We are convinced from our examination of the record that the jurors selected could and did give the defendant a fair trial and that the trial court did not abuse its discretion in denying the motion for a change of venue. See, also, *State v. Brown* (1948), 31 Wn. (2d) 475, 483, 197 P. (2d) 590, 202 P. (2d) 461, and cases cited therein; *State v. Whitfield* (1924), 129 Wash. 134, 137, 224 Pac. 559.

2. *Re continuance:* Nor is there merit in the contention that the trial court erred in denying the defendant's motion for a continuance. The homicide occurred March 21, 1955, and the defendant was arrested the same day. Counsel who represented him were appointed March 28th. The arraignment was April 11th, and at that time the case was set for trial June 27, 1955. The trial began on that date and continued until July 12th. There was no undue haste,

and no claim that the defendant did not have adequate time for the preparation of his defense. The principal reason urged for delay from June until sometime in the fall was that public passion and prejudice in the community might be allayed; however, we have found no indication of such passion or prejudice. The granting of the requested continuance was a discretionary matter with the trial court, and we find no abuse of discretion.

██ 3 and 4. *Re examination of jurors on voir dire*: We shall not go into detail concerning the defendant's objections to the questions asked by the prosecutor on the *voir dire* examination. While the examination of prospective jurors might well have been more strictly limited, the state and the defense were equally at fault in their frequent forays beyond the field of legitimate inquiry. The error, if any, was not prejudicial. It is to be noted that the defendant accepted the jury while having available four peremptory challenges; nor did he challenge the panel. It would seem that he did not believe that the jury was prejudiced by the *voir dire* examination until it found him guilty. See *State v. Farley* (1955), 48 Wn. (2d) 11, 15, 290 P. (2d) 987; *State v. Tharp* (1953), 42 Wn. (2d) 494, 498-9, 256 P. (2d) 482.

5. *Re misconduct of the prosecuting attorney in his closing argument, in the expression of his and his assistant's personal opinions about the degree of punishment*: The prosecutor, in his closing argument, said:

"Mr. Petrich and I both feel—and the way I feel, of course, is not important—that this is a case indeed in which the punishment inflicted should be capital. . . ."

An expression of personal belief by a prosecuting attorney as to the guilt of a defendant is objectionable for the reasons indicated in *State v. Case* (1956), 49 Wn. (2d) 66, 298 P. (2d) 500.

██ Guilt is a fact to be determined from the evidence. On the other hand, whether the death penalty should be *imposed in a particular case is in itself always a matter of opinion, not a fact that can be established by the evi-*

dence. The vice of an expression by the prosecutor of his opinion on the issue of capital punishment is that, unless his statement is carefully "hedged" to make it clear that what he says on that issue is predicated upon the jury's having first found the defendant guilty, his belief in the guilt of the defendant inheres in his opinion that the death penalty should be inflicted. In the instant case, the commission of a homicide by the defendant was not an issue. The prosecuting attorney stated the evidence which not only established the guilt of the defendant but also formed the basis of his opinion that the death penalty was proper. Taken in its entirety, it was proper argument.

■ Further, both of the trial counsel for the defendant had, in their argument to the jury, expressed their opinions on whether the death penalty should be imposed. By so doing, they invited the rejoinder by the prosecuting attorney in his closing argument. See *State v. Brown* (1949), 35 Wn. (2d) 379, 213 P. (2d) 305; *State v. Buttry* (1939), 199 Wash. 228, 90 P. (2d) 1026; *State v. Evans* (1927), 145 Wash. 4, 258 Pac. 845; *State v. Peeples* (1912), 71 Wash. 451, 129 Pac. 108.

6 and 7. *Re misconduct of the prosecuting attorney in asking that the courtroom be locked during his closing argument, and error of the trial court in complying with his request*: The contention is that the appellant was deprived of his constitutional right to a public trial, guaranteed to him by Art. I, § 10 and the tenth amendment to the state constitution, when the court directed that the courtroom door be locked during the closing argument of the prosecuting attorney and the bailiff complied with the order. No prejudice is claimed to have resulted therefrom; the appellant stands squarely on our holding that, if a right to a public trial is invaded, prejudice will be presumed. *State v. Gaines* (1927), 144 Wash. 446, 463, 258 Pac. 508. See, also, *Tanksley v. United States* (1944), 145 F. (2d) 58, 59, 156 A. L. R. 257; *Davis v. United States* (1917), 247 Fed. 394, 398-9; *State v. Osborne* (1909), 54 Ore. 289, 291, 103 Pac. 62, and cases cited therein.

The prosecuting attorney made the request "so that the jury won't be disturbed by constant opening and closing of the door." The trial court, directing the locking of the door, said: "Let the record show that the direction is given to the bailiff so that counsel may be free from interruptions and for no other purpose." Those in the courtroom when the prosecuting attorney began his closing argument were permitted to remain. (It would seem that under the court's order they became a captive audience.)

We do not commend or approve what was done. The language of the trial court was unfortunate, inasmuch as it is not the convenience of counsel that furnishes a reason for locking a courtroom door but, rather, the reason given by the prosecuting attorney: ". . . so that the jury won't be disturbed by constant opening and closing of the door."

There can be no question of the right of a trial judge to direct that the courtroom doors be locked to prevent overcrowding, or to have ejected or excluded from the courtroom persons whose object and intention is to create a disturbance, or to take such action as may be necessary to prevent any interference with orderly procedure.

The locking of the courtroom door during the giving of instructions was held not to deprive the defendant of a public trial in *People v. Buck* (1941), 46 Cal. App. (2d) 558, 562, 116 P. (2d) 160. In that case, it was said:

"It is apparent that the order was made for the convenience of the court and all others present, including the appellant. It was made to facilitate the instructing of the jury and to obviate the disturbance and distraction which is made by spectators entering or leaving while the court is giving its instructions. This seemingly was the view taken at the time by the appellant and his counsel for no complaint was made during the trial. The court did not order anyone to leave the courtroom. It merely attempted to keep the spectators from moving in or out during the period of instruction. In this particular instance it is to be observed that the court instructed the jury before the argument of counsel and that the doors of the courtroom were opened during the argument. The term 'public trial' is used in a relative sense and its meaning depends largely

upon the circumstances of each particular case. Here we cannot say that the order in question prejudiced the defendant's rights or that he was thereby deprived of a fair, public trial."

In *Bishop v. State* (1923), 19 Ala. App. 326, 97 So. 169, the trial judge had ordered the courtroom door locked about midway of the trial. Some two hundred people were then in the courtroom but it was not uncomfortably filled and seats were still available. Answering the contention that the locking of the door was an invasion of the defendant's constitutional right to a public trial, the Alabama court of appeals said (p. 328):

"It is evident that the court was annoyed by the noise of people passing in and out of the courtroom during the progress of the trial, and that this brought about the order to the sheriff to 'lock the outside door.' . . .

"The trial court may in its discretion regulate the attendance to such numbers of people as may conveniently and comfortably get into the courtroom without interfering with the proceedings of the court. [Case cited.]

"In the instant case there were sufficient attendants or spectators present to render the trial a public one within the requirement of section 6 of the Constitution."

In 156 A. L. R. 265-297, there is an interesting and valuable annotation covering the subject of what constitutes a public trial under constitutional provisions such as ours. As indicated in the California case of *People v. Buck*, quoted *supra,* the term "public" is a relative one, and the interpretation of the word under varying conditions and circumstances accounts for the differences of view which exist on that point.

When a trial court, in its discretion, concludes that the movement of the public to and from the courtroom is so annoying and disturbing as to interfere with the trial, the requirement of a public trial is fairly met if the trial court allows, without partiality or favoritism, a reasonable number of people to be in attendance.

If an order of a trial court clearly deprives a defendant of his right to a public trial, as in *People v. Jelke* (1954), 308 N. Y. 56, 123 N. E. (2d) 769, it is unnecessary

for the defendant to raise the question by objection at the time of trial. *State v. Marsh* (1923), 126 Wash. 142, 145-6, 217 Pac. 705.

However, if, as in the present case, a reasonable number of people are in attendance and there has been no partiality or favoritism in their admission, an order excluding the admittance of others may be entered if justification exists. The issue then becomes whether the trial court abused its discretion in so ordering, *i.e.*, whether the order complained of was necessary to prevent interference with the orderly procedure of the trial. Where the ruling is discretionary, a defendant who does not object when the ruling is made waives his right to raise the issue thereafter. *Keddington v. State* (1918), 19 Ariz. 457, 462, 172 Pac. 273. A trial court is entitled to know that its exercise of discretion is being challenged; otherwise, it may well believe that both sides have acquiesced in its ruling. (We would add that this is a discretion that should be sparingly exercised; even the suspicion of an invasion of a defendant's constitutional right to a public trial should be avoided.)

There is here no claim of actual prejudice; there was no objection to the discretionary ruling. We are satisfied that the defendant did have a public trial within the purview of our constitutional provisions.

8. *Re misconduct of the prosecutor in moving to strike the testimony of two defense witnesses*: We are satisfied that the prosecutor acted in entire good faith in making the motion, and that there was no prejudice.

■ 9. *Re comment by the trial court in ruling on the prosecutor's motion to strike the testimony of Dr. Ralph M. Stolzheise*: The statement complained of, made after the prosecutor's motion, was: "I will have to deny the motion. I don't quite feel that the motion lies—the comment goes to the weight of the testimony."

The "comment" referred to in the court's statement was the reason advanced by the prosecutor for striking the testimony. When the defendant's counsel complained that the court's ruling amounted to a comment on Dr. Stolzheise's

testimony, the court immediately gave a cautionary instruction. The error, if any, was cured by the instruction given.

 10. *Re claimed error in instruction No. 16½*: Appellant urges that the question of second-degree murder was removed from the jury by the trial court's instruction that

". . . if the defendant is shown by the evidence beyond a reasonable doubt, to have killed the deceased by an act, the natural and ordinary consequence of which would be to produce death, then it will be presumed that the death of the deceased was designed by the defendant, unless the facts and circumstances of the killing, or the evidence, creates a reasonable doubt whether the killing was done purposely."

Appellant assumes that "design" means "premeditated design" and that the two are synonymous. There is no basis for such an assumption; a distinction is clearly recognized. Under our murder statute,

"The killing of a human being, unless it is excusable or justifiable, is murder in the second degree when—

"(1) Committed with a design to effect the death of the person killed or of another, but without premeditation; . . ." (Laws of 1909, chapter 249, § 141, p. 930 [*cf*. RCW 9.48.040])

and is murder in the first degree when committed with a "premeditated design to effect the death of the person killed, or of another." Laws of 1919, chapter 112, § 1, p. 273 [*cf*. RCW 9.48.030].

The instruction distinguished between "design" in second-degree murder and "premeditated design" in first-degree murder. The word "design" in instruction No. 16½ was correctly used, and the instruction is a correct statement of the law.

11. *Re the giving of instructions Nos. 22 and 24, on mental irresponsibility and the failure to give the appellant's proposed instructions on that subject*: We come now to the assignment of error to which the appellant devotes the greater part of his brief. The defense was insanity or mental irresponsibility. The trial court instructed that the

defendant, to be acquitted on a plea of mental irresponsibility, must convince the jury, by a preponderance of the evidence, that at the time of the crime "his mind was diseased to such an extent that he did not have the ability to distinguish between right and wrong with respect to the act charged."

The appellant contends that the two instructions given "were an abortive attempt . . . to give instructions on the so-called 'right-and-wrong test' or the M'Naghten rule," and bases his criticism in part upon the omission of a statement of the requirement that, to establish a defense of mental irresponsibility, it must appear that he did not know the nature and quality of his act. This objection was not brought to the attention of the trial court by exceptions to the instructions, and ordinarily would not be considered on appeal.

This criticism of the instructions given seems to be predicated upon the fallacious idea that the state must prove that a defendant had the mental capacity to distinguish right from wrong and that he knew the nature and quality of his act. Unlike the District of Columbia and certain other jurisdictions where, if some proof of mental irresponsibility is presented, the burden of establishing mental responsibility is with the prosecution, we have consistently held that the defense of mental irresponsibility must be established by the defendant by a preponderance of the evidence. *State v. Maish* (1947), 29 Wn. (2d) 52, 185 P. (2d) 486; *State v. Hartley* (1946), 25 Wn. (2d) 211, 170 P. (2d) 333; *State v. Schafer* (1930), 156 Wash. 240, 286 Pac. 833; *State v. Craig* (1909), 52 Wash. 66, 100 Pac. 167.

Our cases make it very clear that a defendant, to establish a defense of mental irresponsibility, must prove that he did not have the mental capacity to distinguish between right and wrong with reference to the act complained of. *State v. Putzell* (1952), 40 Wn. (2d) 174, 242 P. (2d) 180; *State v. Rio* (1951), 38 Wn. (2d) 446, 230 P. (2d) 308; *State v. Henke* (1938), 196 Wash. 185, 82 P. (2d) 544; *State v. Carpenter* (1932), 166 Wash. 478, 7 P. (2d) 573;

*State v. Long* (1931), 163 Wash. 607, 1 P. (2d) 844; *State v. Craig, supra.*

 This the instructions required; but they did not require, as they might well have under the M'Naghten rule, that he prove that he did not have the mental capacity to know the nature and quality of his act. The instructions given, in so far as they did not accurately state the M'Naghten rule, were favorable and not prejudicial to the defendant, in that they omitted one of the elements that the defendant could have been required to prove in order to establish his defense of mental irresponsibility.

Appellant contends, further, that the right-and-wrong test is archaic, inadequate, and not scientific, and that it should be abandoned in favor of a more enlightened and psychiatrically-sound test.

The same cases which make it clear that a defendant must prove that he did not have the capacity to distinguish between right and wrong, make it equally clear that there is no alternative in this state to the right-and-wrong test. *State v. Putzell, supra; State v. Rio, supra; State v. Henke, supra; State v. Carpenter, supra; State v. Long, supra; State v. Craig, supra.*

Because of the widespread criticism of the right-and-wrong test, we have given serious and extended consideration to the question of whether we should abandon it and adopt some other. The appellant, by the requested instruction and by an able and comprehensive argument, suggests the adoption of the test recently adopted by the courts of the District of Columbia and used by those of New Hampshire since 1870.

Under this test, to find a defendant not guilty by reason of insanity or mental irresponsibility, the jury must find (1) that he was suffering from a diseased (or defective) mental condition at the time of the commission of the act charged against him, and (2) that there was a causal relation between such diseased (or defective) mental condition and the act. (The words in parentheses have been added to the New Hampshire rule by the courts of the District of Columbia.)

In the application of this rule, known as the Durham rule because of the decision in *Durham v. United States* (1954), 214 F. (2d) 862, the word "diseased" is used to mean a condition which is considered to be capable of either improvement or deterioration; the word "defective" is used to mean a condition which is not considered capable of either improvement or deterioration and which may be either congenital, the result of injury, or the residual effect of a physical or mental disease. For discussion of the *Durham* case and *Stewart v. United States* (1954), 214 F. (2d) 879, which followed it, see: Douglas, The Durham Rule: A Meeting Ground for Lawyers and Psychiatrists, 41 Ia. L. Rev. 485 (1956); Soboloff, Insanity and the Criminal Law: From M'Naghten to Durham, and Beyond, 41 A.B.A.J. 793 (1955); Hayden, The Psychopathic Personality: Treatment and Punishment Alternatives Under Current and Proposed Criminal Responsibility Criteria, 10 Rutgers L. Rev. 425 (1955); Insanity and the Criminal Law—a Critique of Durham v. United States, 22 U. Chi. L. Rev. 317 (1955); Comment, 53 Mich. L. Rev. 963 (1955); Comment, 40 Ia. L. Rev. 652 (1955); Comment, 24 Fordham L. Rev. 273 (1955); Comment, 54 Col. L. Rev. 1153 (1954); Note, 15 Md. L. Rev. 44 (1955); Note, 34 Nebr. L. Rev. 690 (1955); Note, 4 Utah L. Rev. 419 (1955); Note, Wis. L. Rev. 506 (1955); Note, 33 N. C. L. Rev. 656 (1955); Note, 43 Georgetown L. J. 58 (1954).

We have considered also the report of the Royal Commission on Capital Punishment (1949-1953), in which it is contended (p. 80) that the right-and-wrong test is based upon "an entirely obsolete and misleading conception of the nature of insanity." Its conclusion is (ps. 116, 275) "that the law on the subject ought to be changed." Consideration has likewise been given to *State v. White* (1954), 58 N. M. 324, 270 P. (2d) 727, and to the alternative tests suggested by the American Law Institute's "Model Penal Code."

It is urged that the Durham test is more humane and will avoid branding as felons individuals whose real need is psychiatric care. It is also urged that the Durham rule

frees the psychiatrist from the "legalistic straight jacket" of the right-and-wrong test and "enables him to testify in the language of his discipline" (or what someone has, perhaps unkindly, called "the jargon of his profession").

As early as 1909, this court was asked to consider the New Hampshire rule as laid down in *State v. Pike* (1870), 49 N. H. 399, and *State v. Jones* (1871), 50 N. H. 369. In *State v. Craig, supra,* we criticized that rule and refused to follow it. Judge Chadwick, speaking for the court and referring to the *Pike* case, said therein (p. 71):

"That case is a long and somewhat abstruse attempt to qualify the general rule. It, in any event, could have no possible application in this state, for the conclusion of the court is based upon the proposition that the testimony of nonexpert witnesses will not be received to show insanity, and that, when the experts who 'knew all that was known on the subject' had expressed an opinion that a man was insane, that fact was fixed, and the court, who was 'profoundly ignorant of mental disease,' should refrain from submitting to the jury the question of the capacity of the defendant to distinguish between right and wrong with reference to the particular act. In this state the testimony of nonexpert witnesses is competent to show insanity. [Cases cited.] Hence the force of this authority is destroyed."

It is imperative that, if the issue of insanity or mental irresponsibility is to be determined by juries, we must have tests which can be applied by laymen.

Another statement by Judge Chadwick in *State v. Craig, supra,* fairly accurately states our feeling, if not our thinking, as of now on the proposed change (p. 71):

"When a jury of laymen are invited to go further than to answer the question. [Sic] Had the accused sufficient capacity at the time of committing the act to distinguish between right and wrong with reference to it, they are invited to enter the realm of speculation where even the opinion of the alienist is met by like opinion, and he can find no guide to clear his doubt or direct him toward a truthful verdict."

Recognizing the wide variance of the frequent mental or emotional disturbances from which everyone suffers, we

have, for the purpose of judicial administration, adopted various tests or standards to determine whether individuals have the mental capacity to contract, to marry, to make a will, to participate intelligently in their own defense, or to form a criminal intent. Certain other tests or standards have to be met before society will take the life of an individual who has been sentenced to death. Our search is for practical rules that enable us to determine whether a contract should be enforced, a marriage validated, a will upheld, a trial conducted, a defendant in a criminal case held responsible for his offense, or a death sentence executed.

In the particular area with which we are dealing, we are, of course, concerned with the proper care of the mentally ill killer, robber, or rapist; but we are more concerned—and should be—with the security of society and its protection from such offenses and offenders. The law inquires not into the peculiar constitution of mind of the accused, or the mental weaknesses or disorders or defects with which he may be afflicted, but solely into the question of his capacity, at the time he committed a forbidden act, to have a criminal intent.

On the question of the existence of a better method to determine that intent than the right-and-wrong test, we have an open mind. We are concerned, however, not only with what psychiatrists and writers for legal periodicals believe the tests should be, but with what trial judges, who deal with juries at firsthand, believe would be the effect of any proposed change. We are unwilling, on the basis of our present research, to suggest a prospective change in the rule. Appellant asks us not only to make such a change, but to make it retroactive. Whether it would ever be made retroactive we doubt, but do not need to determine. Certainly it would be made retroactive only to prevent a manifest miscarriage of justice, and of that there is no indication in this record.

The change announced by the court of appeals for the District of Columbia in *Durham v. United States, supra*, on which appellant relies so heavily, was a prospective change.

The court had determined that Durham's conviction must be reversed and a new trial granted for various errors, and then announced that it regarded the right-and-wrong test for mental responsibility as inadequate and that a broader test should be substituted on the retrial. We quote (p. 874):

"In the District of Columbia, the formulation of tests of criminal responsibility is entrusted to the courts and, in adopting a new test, we invoke our inherent power to make the change prospectively.

"The rule we now hold must be applied on the retrial of this case and in future cases is not unlike that followed by the New Hampshire court since 1870. It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."

In a footnote to that opinion, it is said (p. 874):

"Our approach is similar to that of the Supreme Court of California in People v. Maughs, 1906, 149 Cal. 253, 86 P. 187, 191, where the court prospectively invalidated a previously accepted instruction, saying:

" ' . . . we think the time has come to say that in all future cases which shall arise, and where, after this warning, this instruction shall be given, this court will hold the giving of it to be so prejudicial to the rights of a defendant, secured to him by our Constitution and laws, as to call for the reversal of any judgment which may be rendered against him.' "

▆▆▆ The trial court did not err in giving the instructions complained of, nor did it err in refusing to give the appellant's proposed instruction based upon the test laid down in *Durham v. United States, supra.*

12. *Re claimed error in giving instruction No. 25, in which it was stated that an irresistible impulse is not a defense*: The instruction correctly states the law in this state (*State v. Maish* (1947), 29 Wn. (2d) 52, 59, 185 P. (2d) 486), but the appellant urges that there was no claim of irresistible impulse and no evidence to justify an instruction on the subject. The testimony of Dr. Stolzheise clearly justified the giving of the instruction.

13. *Re claimed error in giving instruction No. 36, relating to the death penalty, and in failure to give appellant's proposed instruction on the subject*: It is urged that a jury is entitled to know that, if the death penalty is not imposed, a life sentence is mandatory.

The trial court properly limited the scope of the instruction given to the determination of whether the death penalty should be imposed. An instruction that, the defendant having been found guilty, a life sentence is mandatory if the death penalty is not imposed, is misleading unless the jury is also informed of the functions and powers of the board of prison terms and paroles. A mandatory sentence of life imprisonment is not a mandate of imprisonment for life. See Laws of 1951, chapter 238, § 1, p. 756 [*cf.* RCW 9.95.115].

14. *Re claimed error in supplemental instruction*: Twenty-two hours after the case had been given to it, the jury submitted the following question to the trial court:

"Is premeditation of murdering one party or of murdering anyone present regarded by law as premeditation of the resulting murder?"

The court thereupon gave the following additional instruction:

"Under the law of this State . . . the killing of a human being, unless. it is excusable or justifiable, is murder in the first degree when committed with a premeditated design to effect the death of the person killed, or when the killing is done without design to effect death, by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of a robbery.

"The premeditation which the law requires need not be directed to a particular person known to the alleged slayer in advance of the event. It is sufficient if the alleged slayer [premeditates] effecting the death of whomsoever he may encounter. Therefore, if you find that the defendant returned to the motel premeditating the killing of whomsoever he might encounter in that place, you may find that he premeditated the death of Andrew K. Stolen, even though before gaining admission to the motel he did not know the identity or even of the existence of Andrew K. Stolen."

The appellant's exceptions to the instruction were in some respects too general to require consideration (for example, "entirely improper and not in accord with the law of the State of Washington"). On the following two points, his exceptions were specific:

". . . it is a comment on the evidence."

". . . it brings up a new issue to the Jury whereby under this instruction they can take into consideration mishap or misadventure on the part of the defendant, and there is no evidence in the record here to indicate that there was mishap or misadventure on the part of the defendant in the killing of Andrew Stolen."

■■■ This instruction does not constitute a comment on the evidence. It states that, if the jury should find a certain state of facts to exist, the law as given in the instruction would be applicable. An instruction may refer to the evidence

". . . so long as the reference made does not amount to an explanation or criticism of the evidence, or assert or assume that a particular fact is proven thereby . . ." *French v. Seattle Traction Co.* (1901), 26 Wash. 264, 270, 66 Pac. 404.

See, also, *State v. Bogart* (1944), 21 Wn. (2d) 765, 153 P. (2d) 507; *State v. Roberts* (1927), 144 Wash. 381, 258 Pac. 32; *State v. Dukich* (1924), 131 Wash. 50, 228 Pac. 1019.

In considering the other phase of the criticism of the supplementary instruction, we must give consideration to both the section of the statute under which the charge was laid and certain portions of the testimony.

The charge was laid under subds. 1 and 3 of § 1, chapter 112, Laws of 1919, p. 273 [*cf.* RCW 9.48.030(1) (3)], which are as follows:

"The killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed either—

"1. With a premeditated design to effect the death of the person killed, or of another; or . . .

"3. Without design to effect death, by a person engaged in the commission of, or in an attempt to commit, or in

withdrawing from the scene of, a robbery, rape, burglary, larceny or arson in the first degree; . . ."

Sometime between eight and nine p.m. on March 21, 1955, after spending a period of time in a tavern playing shuffleboard and drinking beer, the appellant, having only a dime in his possession, went to the office of the motel operated by Mr. and Mrs. Andrew Stolen. He saw only Mrs. Stolen, and was told by her that the rental for a motel unit was four dollars. He said that was too much, and left. He went directly to the dairy where he was employed and armed himself with the sword and two paring knives. He returned to the vicinity of the motel, parked his car in a secluded spot, and returned to the motel office. When Mrs. Stolen opened the door, he burst through the doorway, swung her around, and attacked her with one of the paring knives. Mr. Stolen, a partial paralytic, apparently in answer to his wife's cries, appeared from the bedroom. Appellant made a couple of slashes at Mrs. Stolen with the sword and then turned his attack to Mr. Stolen, slashing and piercing him several times and finally wounding him fatally.

If the jury believed the defendant was engaged in the commission of a robbery or an attempt to commit a robbery (subd. 3, *supra*), proof of premeditation was not necessary; but under subd. 1, *supra*, it was necessary.

The question that was bothering the jury is obvious: If the defendant premeditated the death of Mrs. Stolen, could it be said that he premeditated the death of Mr. Stolen, whom he had never seen and of whose existence he was not even aware? The instruction complained of was designed to give the answer to that question. It does no more than explain the meaning of the words "or of another" in subd. 1 of the statute, by explaining that, to establish premeditation, an intent to kill any specific person need not be proved; an intent to kill any person who may be at a certain place or who may attempt to do a certain thing is sufficient. *State v. Baker* (1928), 150 Wash. 82, 272 Pac. 80; *Williams v. Commonwealth* (1920), 128 Va. 698, 104 S. E. 853. We fail to see wherein the element of

mishap or misadventure was introduced into the case by the instruction.

There is no merit in the appellant's exceptions to the supplemental instruction.

15. *Re testimony claimed to be erroneously excluded*: The exclusion of some testimony by three witnesses is referred to in the briefs. The excluded testimony is said to have been offered in support of the defense of mental irresponsibility.

■ It is agreed that, when the defense is insanity, general or partial,

". . . *any and all conduct* of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity." 2 Wigmore on Evidence (3d ed.) 9, § 228, quoted in *State v. Odell* (1951), 38 Wn. (2d) 4, 20, 227 P. (2d) 710.

■ The appellant was entitled to submit such evidence as he wanted, provided only that it was relevant and competent to sustain his plea. *State v. Williams* (1949), 34 Wn. (2d) 367, 209 P. (2d) 331; *State v. Flanney* (1911), 61 Wash. 482, 488, 112 Pac. 630. The question before us, then, is whether by the rulings of the trial court the appellant was prevented from introducing relevant, competent, and material evidence in support of his contention that at the time of the commission of the offense he was not mentally responsible. See *State v. Williams, supra.*

In those instances where no offer of proof was made, we are without information as to what testimony the appellant was prevented from introducing in support of his plea of mental irresponsibility; consequently, we are unable to determine whether he was in any way prejudiced by the rulings of the trial court. *State v. Williams, supra.* The defense was given great latitude, and if it desired to get any other statement or conduct of the defendant before the jury, the record does not show it.

The only excluded testimony in which an offer of proof was made is that of a police officer who had known the defendant before his arrest, and to whom the defendant

had made a confession and had talked quite freely. The officer testified that the defendant had told him about "raider training" which he had had. Then the following occurred:

"Q. [By Mr. Vanzant, defense counsel]: Could you tell the court whether or not that was similar to the type of Raider training that you had?

"MR. O'CONNELL: If Your Honor please, we will object to this question because it is hearsay."

The jury was excused, and the following offer of proof was made:

"We intend to show, Your Honor, that this witness and the military record of Harvey Collins are parallel. They had the same training, specialized training, to kill. They had the same experiences over on Iwo Jima . . ."

The objection was sustained.

 The defendant, without taking the stand as a witness and without putting copies of his military record in evidence, was trying, as the offer of proof indicates, to get a selected part of his military record before the jury. The question asked called for no testimony as to anything the defendant had said or done; consequently, it was not admissible under the rule laid down in the *Odell* case, *supra*. The objection was properly sustained.

It should be added that the prosecution and the trial court gave the defendant free rein as to the admission of testimony concerning anything he had ever said or done. The same officer of whom we have been speaking was permitted to testify that the defendant told him that, during his military training:

" 'They taught me how to kill. They gave me a gun, they gave me a knife. They taught me how to kill even with my hands.' . . . He says, 'I just didn't forget how.' "

The officer was also permitted to testify that he, himself, had received raider training, to explain the nature of the training, and to testify to conditions existing during the battle of Iwo Jima. This testimony was admitted conditioned upon there being evidence on behalf of the de-

fendant, other than his own hearsay statements to the officer, that he had had raider training and had participated in the battle of Iwo Jima. That condition was not met.

16. *Re refusal to grant appellant's motions in arrest of judgment and for a new trial:* These motions were based upon the foregoing fifteen assignments of error, and no further discussion is necessary.

In conclusion, we wish to say that the court-appointed counsel for the appellant, Andrew L. Garnes and J. Houston Vanzant, Jr., conducted the defense competently and vigorously; and that on this appeal the latter, with no assurance of either fee or repayment of out-of-pocket expenses, has spared no effort on behalf of his client. The appellant insisted that he wanted the appeal dismissed and wanted only to "accept the penalty." Mr. Vanzant disclosed to the court his client's attitude and asked whether, under such circumstances, he could or should continue the appeal. We felt that, under the peculiar circumstances of the case, any claimed error at the trial should be examined by this court. We are satisfied that the record contains no prejudicial error, and that Harvey John Collins was ably defended and had a fair trial.

Judgment and sentence affirmed.

ALL CONCUR.